The Honorable M. Olin Cook State Representative 266 South Enid Avenue Russellville, AR 72801-4534
Dear Representative Cook:
I am writing in response to your request for my opinion on various questions arising from the following facts:
 The Russellville City Council recently passed an ordinance that required citations to be issued to area businesses that exceed a preset number of false alarms caused by security systems. This has become a problem for the Russellville schools.
You have further provided me a copy of the recently passed Ordinance 1750, which provides for either criminal or civil penalties in the form of fines imposed upon any alarm system provider, alarm system monitor and/or alarm system user deemed responsible for allowing excessive false alarms to issue from any given location during the course of a calendar year. The ordinance further prohibits the installation of automatic dialing telephone alarm systems, imposes certain conditions on alarm system monitoring and directs that all alarm system monitoring companies "[o]btain all necessary business licenses as required by the City and the State of Arkansas." The ordinance directs that any civil or criminal fines imposed" shall be heard in the City of Russellville District Court."
Against this backdrop, you have posed the following questions:
 1. Can the City of Russellville take action against another state entity?
 2. Can the City of Russellville levy a civil penalty against the school district?
RESPONSE
With respect to your first question, the city is not a "state entity," as your question implies, and it would be foreclosed from "taking action" against a true "state entity" by the doctrine of sovereign immunity. Ark. Const. art. 5, § 20. With respect to your second question, I believe a court would in all likelihood uphold the city's authority to levy a civil penalty against a school district pursuant to Ordinance 1750 for multiple false alarms issuing from any given school. However, although your questions do not directly raise the issue, I believe the provisions of the ordinance purporting to regulate the businesses of alarm installation and monitoring are invalid in light of A.C.A. § 17-40-106, which locates the authority to impose such regulations exclusively in the Arkansas Board of Private Investigators and Private Security Agencies.
Question 1: Can the City of Russellville take action against anotherstate entity?
I consider the term "another" in your question somewhat confusing, since it implies that Russellville is itself a "state entity." A city is a political subdivision of the state, but it is not a "state entity" of the sort that might, for instance, be entitled to invoke the state's sovereign immunity from suit pursuant to Ark. Const. art. 5, § 20. The distinction between "political subdivisions" and "state entities" such as state agencies, boards and commissions is recognized in the statute defining the jurisdiction of the State Claims Commission, an arm of the legislature that constitutes the only entity authorized to hear claims against the state:
 Except as otherwise provided by law, the Arkansas State Claims Commission shall have exclusive jurisdiction over all claims against the State of Arkansas and its several agencies, departments, and institutions but shall have no jurisdiction of claims against municipalities, counties, school districts, or any other political subdivisions of the state.
A.C.A. § 19-10-204(a).
Given the factual context of your question, I suspect your reference to "another state entity" might be to the Russellville School District. Like a municipality, a school district is not a "state entity" of the sort entitled to sovereign immunity. In Dermott Special School District v.Johnson, 343 Ark. 90, 96, 32 S.W.3d 477 (2000), the Arkansas Supreme Court offered the following regarding the relationship of school districts to the state:
 It would appear that a school district is in the same legal category as a housing authority. Both are created by the General Assembly, both are termed, and are body corporates, and both may sue and be sued. In Fagan Electric Co., Inc. v. Housing Authority, City of Blytheville, 216 Ark. 932, 228 S.W.2d 39, we held that these public corporations are no more an agency of the State than is any other corporation as to which the State has done nothing except to bring into existence. Similarly, the State's connection with school districts has been limited to the act of bringing such districts into being.
Accord Muse v. Prescott School District, 223 Ark. 789, 791-92,349 S.W.2d 329 (1961) (noting that a school district is a political subdivision, not an agency of the state, and hence not entitled to sovereign immunity).
To answer your question, then, assuming the referenced "state entity" were indeed that — namely, an arm of the state itself — sovereign immunity would preclude the city of Russellville from "taking action" against it either in Russellville District Court or any other court. As discussed above, the law clearly directs that any action for monetary recovery against the state proceed before the Claims Commission or not at all. I will address in my response to your next question the city's potential ability to "take action" against the school district.
Question 2: Can the City of Russellville levy a civil penalty against the school district?
Although a school district does not have sovereign immunity, it does have a limited immunity from suit pursuant to A.C.A. § 21-9-301, which provides:
 It is declared to be the public policy of the State of Arkansas that all counties, municipal corporations, school districts, special improvement districts, and all other political subdivisions of the state and any of their boards, commissions, agencies, authorities, or other governing bodies shall be immune from liability and from suit for damages except to the extent that they may be covered by liability insurance. No tort action shall lie against any such political subdivision because of the acts of its agents and employees.
However, I do not believe this statute would apply to preclude the city from regulating and penalizing the school district. As reflected in the statute's final sentence, the legislature's limited grant of immunity to school districts applies only to actions in tort, a category of claim that does not include the violation of an ordinance.
In my opinion, then, neither sovereign nor statutory immunity would invalidate the ordinance with respect to the school district. However, the question remains whether one political subdivision has the authority to regulate another. In considering this question, one leading commentator has offered the following:
 School districts are not uncommonly within the same boundaries as a general purpose government. Whether or not such districts are bound by municipal zoning and building regulations may depend on state policy regarding education and the reasonable local implementation of that policy. . . . [W]here constitutional and statutory provisions indicate education is to be regarded as a central state function, a school district may be exempted from local building regulations in constructing a school building. However, where state policy also favors local control over school affairs, school districts may not be so exempt. Further, school districts have been more consistently bound by local zoning as to school construction sites, and off-street parking.
 Additionally, the court may also look to the relative importance of the interest served from a local point of view where the interlocal dispute involves overlapping jurisdictions. Accordingly, a county's police power interest prevailed over a city's interest in equitable distribution of available parking space where the city desired to install parking meters on a sea wall that protected against erosion.
Eugene McQuillin, The Law of Municipal Corporations § 3A.15, at 457-58 (3d ed. 1999) (footnotes omitted).
Assuming a court were to follow the foregoing analysis, the proper approach in this case would be to balance the interests of the two political subdivisions — namely, the city's interest in avoiding the needless diversion of its police resources on false alarms against the district's interest in regulating its own affairs, including security matters.[1] As McQuillin points out in his treatise: "Such competing interests or overlapping responsibilities cannot be reduced to a rigid mathematical formula." McQuillan, supra at § 3A.18, at 462. By way of illustration and elaboration, he continues:
 Reasonable municipal regulations that are designed not to prevent construction and operation of a special district's plant, but rather to provide for the health and welfare of the municipality's residence [sic] in connection with the plant's construction and operation are not in fatal conflict with the special district's constitutive legislation. However, a special district is not required to obtain the permission of a municipality to undertake its statutorily authorized operations, although it is subject to a municipality's reasonable regulations to insure that the activities of the district are safely conducted. Furthermore, a municipality is not required to demonstrate its good-faith ability to enforce its ordinances as to the public at large prior to enforcement against a special district, in the absence of evidence that the municipality intended selective enforcement.
 Whether an ordinance directed at a special purpose unit is reasonable is a question of law. The standard of evaluation is whether a municipality has abused its discretion in enacting the ordinance, which must be presumed valid until the facts show abuse. The relevant facts include the evil sought to be remedied, the effect of the ordinance on citizens, and the effect upon the city should they not be applied.
Id. (footnotes omitted).
It does not appear to be the case, then, that some structural principle of government would necessarily preclude the city of Russellville from enacting an ordinance binding on the Russellville School District. Rather, determining the validity of the ordinance as applied to the district would probably entail asking, first, whether as a general proposition sanctioning the issuance of excessive false security alarms constitutes a valid exercise of the municipal police power and, second, if so, whether the strength of the city's interest in exercising that power over public, as well as private, entities outweighs the strength of the school district's interest in operating autonomously, subject to oversight by the Board of Education. See Lavender v. City of Rogers,232 Ark. 673, 675, 339 S.W.2d 598 (1960) (noting that municipalities retain some regulatory authority over school construction notwithstanding the broad statutory grant of authority to the State Board of Education).
With respect to the scope of the police power, the Arkansas Supreme Court has observed:
 [M]unicipalities have the power and duty to make reasonable provisions for the safety of persons and property and municipal authorities have wide discretion in these matters. See City of Ft. Smith v. Van Zandt, 197 Ark. 91, 122 S.W.2d 187 (1938). In Phillips v. Town of Oak Grove, 333 Ark. 183, 968 S.W.2d 600 (1998), we stated that a city has the plenary authority to exercise its police power to protect public health and safety which is founded on public necessity. Id. at 189, 968 S.W.2d at 603. In fact, the mere possibility of public harm is a sufficient basis for a municipality to regulate under its police power. Id. at 191, 968 S.W.2d at 604.
Smith v. City Of Arkadelphia, 336 Ark. 42, 46-47, 984 S.W.2d 392 (1999). As statutory foundation for the police power, A.C.A. § 14-43-602
provides:
 Any city of the first class is authorized to perform any function and exercise full legislative power in any and all matters of whatsoever nature pertaining to its municipal affairs including, but not limited to, the power to tax.
Section 14-55-102 of the Code further provides:
 Municipal corporations shall have power to make and publish bylaws and ordinances, not inconsistent with the laws of this state, which, as to them, shall seem necessary to provide for the safety, preserve the health, promote the prosperity, and improve the morals, order, comfort, and convenience of such corporations and the inhabitants thereof.
Section 14-55-502(a) of the Code further provides:
 The town or city council in all cities or incorporated towns in this state are authorized and empowered to prescribe penalties for all offenses in violating any ordinance of the city or town not exceeding the penalties prescribed for similar offenses against the state laws by the statutes of this state.
In my opinion, unless state law expressly provides otherwise, these statutes would clearly empower a city to cite businesses, if not necessarily schools, for excessively reporting false alarms caused by security systems. However, these statutes must be read in conjunction with A.C.A. § 17-40-106, the only statute that directly addresses the issue of fire-alarm regulation:
 (a) The regulation of investigation, security, and alarm systems businesses shall be exclusive to the Arkansas Board of Private Investigators and Private Security Agencies.
 (b) Licensees and employees of licensees, under the provisions of this chapter, shall not be required to obtain any authorization, permit, franchise, or license from, or pay another fee or franchise tax to, or post bond in, any city, county, or other political subdivision of this state to engage in the business or perform any service authorized under this chapter.
 (c) However, any city or county shall be permitted to require a business operating within its jurisdiction to register without fee and may adopt an ordinance to require users of alarm systems to obtain revocable permits without fee.
Subsection (a) of this statute vests the authority to regulate" alarm systems businesses" exclusively in the Arkansas Board of Private Investigators and Private Security Agencies." This provision casts into question the validity of those sections of the ordinance purporting to regulate businesses engaged in the installation and monitoring of alarm systems. However, it has absolutely no bearing on the provisions of the ordinance regulating alarm system users, a category wholly distinct from "alarm systems businesses."[2] In my opinion, then, the city was acting within the scope of its police powers in enacting the provisions of this ordinance applicable to alarm system users.[3]
The question remains, however, whether Ordinance 1750 should be read as applying only to private users or whether it should be applied to the schools as well. As suggested above, authority in other jurisdictions suggests that this inquiry should involve a weighing of the city's and the school district's respective interests, with the focus being on whether subjecting the school district to the ordinance would best serve the public interest. A court would likely answer this question in the affirmative if it concluded that keeping police officers available to confront actual emergencies would be more important than sparing the school district the effort and expense of installing and maintaining efficient security systems.
Assistant Attorney General Jack Druff prepared the foregoing, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
MP:JD/cyh
[1] The strength of a school district's autonomy as a political subdivision is suggested in the following passage from Wynne PublicSchools v. Lockhart, 72 Ark. App. 24, 29-30, 32 S.W.3d 47 (2000):
 The courts have been reluctant to interfere with the authority of local school boards to handle local problems. Our position was well stated in Safferstone v. Tucker, 235 Ark. 70, 357 S.W.2d 3 (1962): "In this State a broad discretion is vested in the board of directors of each school district in the matter of directing the operation of the schools and a chancery court has no power to interfere with such boards in the exercise of that discretion unless there is a clear abuse of it and the burden is upon those charging such an abuse to prove it by clear and convincing evidence."
See also A.C.A. § 6-13-620(1) (charging the board of directors with the "care and custody of the schoolhouse, grounds, and other property belonging to the district").
[2] The ordinance contains a boilerplate severability clause that a court would in all likelihood honor to salvage the legislation's valid provisions.
[3] I find it odd that A.C.A. § 17-40-106 is totally silent regarding what conduct might justify revoking a user's security-system permit, as subsection (c) authorizes a city to do. Whatever the answer, this issue does not appear to bear directly on your request, since Ordinance 1750 imposes no licensing requirement on users and hence does not include license revocation among the range of penalties applicable to users.